Thank you, Your Honor. May it please the Court, my name is Elizabeth Krusek appearing on behalf of Mr. Aaron Holmes. I will watch the clock and try to reserve about two minutes for rebuttal. The District Court here erred in denying Mr. Holmes's motion to suppress. There's no question that Wilson applies and that there was a warrantless search that then kicked off the flow of evidence that was can be saved by two doctrines, the inevitable discovery doctrine and the good faith doctrine, and the answer to both of those is no, it cannot. My plan is to start with inevitable discovery and then move to good faith unless the Court would prefer otherwise, but I would like to say a few words at the outset about deterrence. The government makes a lot of argument about deterrence and so I want to be clear that there is something to be deterred here and is extremely important and that is the legitimate privacy interests of individuals who would be subject to these kinds of searches. This case illustrates the importance of those privacy interests because what happened in this case, I thought you were going to ask the question, Judge Collins. Well, you know, the privacy interests were to some extent breached by, you know, the tech companies when they send the report in with a hashed image that matches a hashed image in the NCMEC database. Although they didn't attach, you know, they didn't say that they had reviewed the particular image, it's a fingerprint that is to an identifiable image. It's a specific image. It's a description of one image and so that image is, as being in the communication, is already disclosed. Now I know Wilson says that, what it says and that, you know, therefore there's a Fourth Amendment violation here, although there's a circuit split on that, but to your issue of whether or not there was a privacy interest at stake, it's diminished because of that as in the Jacobson case and it raises the question of whether or not privacy interests can be necessarily diminished here and here's why. So the hash match is to, what the hash match should show you is that the same image that has this hash value is the image that is attached to the report. That's the theory. But what that doesn't mean is it doesn't mean it's child pornography. In this case actually illustrates how privacy interests can be invaded because what happened here is that the image was opened and looked at. It was not contraband, but then the— You provided any information in the referral about whether any of these images match NCMEC's known hash list. Yes, one image matched that hash list. So that identifies it as being child pornography. It didn't. It didn't. That's the point of this. It did not identify it as being child pornography because the image that was— NCMEC maintains a known hash list of just, you know, what, art and museums? No. So this illustrates the problem. So the image that was hashed appears to be the same image that was opened. I don't dispute that, but there is also no dispute in this case. The government has never disputed and the agents didn't dispute at the evidentiary hearing that this was not contraband. This image was never used to prosecute my client. What it was used for was to write an affidavit for probable cause. They then looked at the image, saw a child in the image, did some research, decided that perhaps they knew that my client had children of a similar age and they thought potentially similar experience, and then wrote an affidavit suggesting that my client was exploiting his own child, which he absolutely was not doing. And that's the way that they initially got all of these warrants. So it is simply not the case that a hash value match on the NCMEC lists equals child pornography because that's not what happened here. So if the hash value didn't tell the government that this was child pornography, what does it tell the government? It would tell the government that the image is the same image that's on a list. And it's categorized as an A1 image. Is that right? That is correct. And what is the universe of things that get categorized as A1? So the universe of things would be a prepubescent minor engaged in a sexual act. That's how—some person has to make this decision to put these images on a hash value list. And when you make that—when you state that description, it seems like, well, everything within that category is going to be child pornography. But it wasn't in this case. This was an image that was classified as A1, a prepubescent minor engaged in a sex act, and it was not contraband when it was opened. Are you saying that the description or categorization of A1 can be inaccurate or that the categorization of A1 is broader than actual child pornography? It's difficult to know exactly what happened here, but there are areas—there is room for mistake. And I will point out that if you look at ER page 265, one of the agents testifies, I opened these attachments because I need to make sure they're child pornography. Sometimes they're not. So it is not the case that simply opening the image means that you're going to get child pornography, which goes to my dispute with your other point. Just so I understand what you're saying about the record. You're saying that the particular image that matched the NCMEC hash list, even though NCMEC classified it as A1, was not in fact child pornography. It was not. It was not contraband. It was never used to prosecute my client, and the agents clearly admit that. I understand it wasn't used, but was it child pornography? What was depicted on that image? It was an image of a young girl, fully clothed. There was one image in which her face was obscured and one in which it wasn't. I think this is the one where her face was not obscured, and there was a white substance around her mouth. And so, to good faith, my point is this is not a case. This case illustrates that this isn't Jacobson. Opening this only tells you presence or absence of contraband. It doesn't do that. It did far more than that. It was much more like Walter, which is you have to look at the image to understand what it is. In Walter, they had to view the film to understand what it was and whether it was actually prosecutable. When they opened the image here, what they found was not prosecutable, and then they used that. Every single warrant after that was tainted because all of this information was used, this warrantless search for a file that was not contraband that raised suspicions, that allowed the agent to then essentially accuse my client of potentially sexually abusing his own child. And that's how they collected all of the evidence in this case. I took you off of inevitable discovery, which is where you had wanted to start, so can you address that issue? Of course, Your Honor. So, I would say this really hinges on warrants. I think the government filing their 28-J letter on Friday on the street essentially concedes that their excision argument, even if it weren't waived, which it is, their excision argument doesn't work. In this circuit, the law is that failure to obtain warrants is not excused, whether or not you have probable cause. And the logic of those line of cases follows that you also can't cure defective warrants in this hypothetical way. So, that's point one. I want to make sure I reserve some time, but just very briefly, point two would be that there's a tremendous amount of speculation that would require you to decide this case based on inevitable discovery. On that issue, so my understanding from Nick's and other case law regarding the independent investigation is that there's, you know, the government just needs to meet their burden by a preponderance, and we're reviewing for clear error now the finding that there would have been inevitable discovery based on the preexisting independent investigation. And so, why isn't this case based on Agent Rose's independent investigation, which wasn't tainted by any unlawful search, more in the Nick's line of cases? So, as far as Agent Rose, she only had the kick information. That information had no links to Mr. Holmes except for the IP address. And so, that would still, the district court's holding still says she would have had to get a search warrant. So, setting aside, even if we set aside the law on search warrants, which I think precludes that already. Why does that preclude that? Because she didn't get a search warrant for kick. But she didn't do a search without one either. So, I mean, there's, it's only Agent Steele that did a search without a warrant. Agent Rose testified she would have gotten the warrant. She said she would have, and our case law, MHIA, and all of those cases preclude that as a means of applying inevitable discovery. Because having probable cause but not making any attempt to get a warrant doesn't get you there. Well, I get that when the agent has actually done a search that they should have gotten a warrant for. But Agent Rose never did a search without a warrant. No, she didn't. The only warrants that they got were defective. But I would still say, even if we're going to set aside the search issue, you would still have to, there's no basis in the record for the judge to conclude, when was the search going to take place? How were all these people going to be here? Were these people going to be interviewed? They were going to say the same thing. The evidence was going to be in the same condition. It was going to contain all this information. That's hugely speculative. Do you have a case outside of, I understand there's routine procedure, that's a different way. But do you have a case in the NICS line where there's a preexisting independent search where those kinds of contingencies precluded a finding of the inevitable search, inevitable discovery? I can't think, I mean, NICS is sort of the leading case by analogy, I think, for me. Because one of the things that NICS talks about was there's this body. And they actually spend a lot of time about how soon would the body have been found? Would the body have been moved? Would it have been in the same condition? And the government was required to, and had in that case, set forth significant amount of evidence about the timing of the finding of the body and the condition it would have been in. And not just say, well, I would have done my investigation, sort of unfettered by anything. So is it your view that in order for inevitable discovery to apply, everything would have had to historically play out in exactly the same way with people in the same positions and the exact sequence of events? Well, I think that's what the government has to argue. I mean, the government has the burden of showing by a preponderance the evidence. Is there a case that says that specifically, that everything has to be in exactly the same format? Because I don't even think the search in NICS had, you know, he not told where the body was and they had found it. It wouldn't have happened on the same day, in the same time, in exactly the same way. Well, they said the evidence in NICS was that they would have found the body within three to five hours. So it actually would have, there was evidence in the record that showed that it would have occurred on the same day within three to five hours. Right, but there were some contingencies, I would say. There were some contingencies. Right, they had to assume that the volunteers would have searched every culvert, that the search would have been expanded to the next county, that the officer would have done what he actually said, which was to expand the search, draw a new grid, you know, that it wouldn't have snowed. You know, all these things that they had to presume things would have worked out. In some level, yes, but I think at a certain point, I mean, even the Tenth Circuit, which the government cited, and the Tenth Circuit even talks about these various contingencies, and you can't just have a number of contingencies. There has to be some kind of stricture on it. What is your best case for that in the Ninth Circuit? That there's some limit to the, you know, some limiting principle to where we've said, even when there was an independent search, pre-existing search happening, it needed to be, you know, more certain than the one here. So, I mean, honestly, I think NICS, I think there is, Ramirez-Sandoval talks about whether the officers would have questioned particular occupants of a vehicle and decide that there wasn't enough evidence to show that they would have done the questioning. So, I think that line of questioning. I think that was in the routine procedure. Plus, though, it's not so much an independent investigation, but I also think the warrants combined with the level of speculation, I think both those lines of cases have to be taken together here. We've taken you over. I'm going to give you two minutes for rebuttal. Thank you, Your Honor. All right. We'll hear now from Ms. Noel or Noel? Noel, Your Honor. Noel. All right. Good morning and may it please the Court. Caitlin Noel on behalf of the United States. There's no dispute that under Wilson, a Fourth Amendment violation did occur when Agent Steele opened the files that were attached. Am I right that there is a circuit split on that issue that other circuits reject? Wilson or Wilson rejects other circuits? Yes, Your Honor. There is a circuit split. Do you know the status of that split as of today? What's the alignment? In preparing for oral argument, I did look into that, and I believe that it still remains the Ninth Circuit on one side and the Fifth and Sixth Circuit on the other side. And no other circuits have waived it? The Ackerman case is the only other case that has, to my knowledge, weighed in on the question. But Ackerman, which is discussed in the party's briefs, didn't actually address the question that is at issue here. It focused on whether NCMEC was acting as a government agent when it opened the files, and in that case specifically reserved the question of whether there would have been a Fourth Amendment violation had NCMEC only opened a hash-matched file as opposed to the email itself that included the files. Can you address the same question I asked your opposing counsel about whether we have any hash-matches here that were known child pornography? Because what she said is the one hash-match there was was to an image that is essentially the aftermath of child abuse but not actually a depiction of a child sexual act and therefore technically is not child pornography. Is that correct? It is correct that the image... Is there no hash-match in this case to child pornography in another image? So we only have the one hash-match and it's not to child pornography? Within the Facebook referral, the one hash-matched image turned out to not be federally chargeable child pornography. The agents testified, and I apologize, I'm not recalling off the top of my head whether this was Agent Rose or Agent Steele's testimony, but they explained that sometimes what happens with NCMEC's database is that there will be a series of images that depict sexual activity and it's possible that one of those images in itself is not child pornography or an image might be classified as child pornography under a state law but not under the federal definition of child pornography. The image that we had here was not just any old image, like a picture of a birthday party or something like this. This was a photo of a... It depicts evidence that the child has been abused but it doesn't itself meet the definition. That's correct. She's on her knees with adults in front of her. You don't have another hash-match to something that is child pornography in this case? Not for the Facebook referral. The CIC referral did match, had a number of hash-matches to files on the NCMEC database. But the CIC information didn't go in the warrant, did it? No, it did not. But those files had been reviewed by a CIC employee and as Agent Rose testified, when she looked at those files, which was not a problem at all because, as I said, they had been looked at by a CIC employee, she confirmed that nine of those ten files were actual, chargeable child pornography. So there wasn't any question with those ones. The Facebook one, as Defense Counsel is correct, that that was not actual, chargeable child pornography. But it did... It was highly suggestive and indicated that a sexual act with a child had just been committed. She's on her knees with apparent ejaculate on the area around her mouth. Given the reality that this isn't formally contraband, why is Jacobson the right case in terms of the good faith analysis? Well, I think what Jacobson held was that an agent's viewing of what a private party has already made available for inspection doesn't violate the Fourth Amendment. And the question is whether the agents... Well, I thought Jacobson that turned on the fact there was no privacy interest in contraband and you said you're not relying on that argument in your briefing. That is one of the points that the Jacobson case makes. I think here we have the agents relying on the classification that NCMEC does of photographs or images to classify files as child pornography. The agents testified someone at NCMEC is reviewing the files to get them onto their database list. Well, as a matter of technology, and I don't even hear the defense disputing this, as a matter of technology, the hash values are like a fingerprint, as Judge Collins referenced. We've recognized that. I think lots of cases have recognized that. But the difficulty here is if the universe of things that are getting hash valued and being stored by NCMEC are not all contraband, then how are we in the Jacobson box? Which there, the line of reasoning was all we're doing, in addition to what the private party did, is confirming that this is contraband or not. And that can't be the same here because we don't even know. Like just the hash value isn't confirming that it's contraband based on how this case plays out if things are getting hash valued that are not contraband. Well, I would again point to the agent's testimony regarding the fact that these aren't just any pictures. These are pictures that are highly- No, agreed, but if they're not unlawful pictures, nobody here is going to dispute this is a troubling image. But what we're talking about is criminal conduct, and if that image is not criminal in and of itself, at least for federal purposes, then we have a different analysis we have to do. Well, and I think in Jacobson itself, the court didn't have a problem with the fact that the agents opened the inner bag, which had not been done by the FedEx employees, and did the field test to confirm. But that part of the Jacobson analysis, they find there was no search because of the contraband. They say there was no privacy interest in contraband. Here we're saying the thing that was searched or being searched, tested for, could have been not contraband, admittedly. So how does that part of the Jacobson analysis apply? Well, I think just to step back for a moment, we're not trying to relitigate the Wilson decision, as we acknowledge the decision is out and it's binding in the court. But Wilson didn't come out until seven months after the search and the arrests at issue here. And at the time, the only circuits that had weighed in on the issue had said that there isn't, that Jacobson does apply to this situation. Would you fit within the holdings of those cases on these facts? I believe we would, Your Honor. I don't think that either one of those makes a point that the possibility of an image not ending up being child pornography makes, turns it somehow into a search. I don't think that either of those decisions— You have the additional problem here. The agent Steele, I believe, searched, opened another image that didn't even have a hash value. Is that correct? That is correct, Your Honor. Ultimately, those images were nearly identical, so I don't think that that is a separate problem. I think that could have simply been excised. One of the photos, I believe, the child's face was obscured, as defense counsel pointed out, and one of them it was showing. But otherwise, there wasn't any difference there. And as agent Steele testified, even without having opened those files, she still would have sought and obtained the same warrant. She had the knowledge that Facebook had found the hash match to a file in NCMEC's database. That was immediately preceded by the— But our case law is pretty clear to saying when an officer could have gotten a warrant, had probable cause to get a warrant, and did not, that can't save the search. And I think both the Mejia and Riley cases that defendant relies on are distinguishable here because those cases both involve the evidence that's being challenged was found during, basically, searches conducted by illegally obtained consent, and there just was not a warrant found. Here, agent Steele did obtain a warrant. She obtained a warrant using information that seven months later— But she needed to get a warrant to open the images under Wilson, correct? And that's the warrant that she didn't get and should have. And that then taints all the other things, right? And I'm pretty sure under our case law that just the fact that she could have gotten a warrant to open those images doesn't mean that then the search can be saved. I mean, at least it seems to me we have lots of clear precedent on the issue, which is partly why I think that perhaps the district court didn't rely on a good faith exception, and there are multiple issues with relying on the good faith. And the district court actually found the independent search— found an inevitable discovery based on the independent search, which my understanding is that we're now going to review that for clear error. Is that correct? Yes. And as Your Honor pointed out during my colleague's argument, the standard is the government needs to establish by a preponderance of the evidence that the challenge of evidence would have inevitably been discovered. Do you have a closer analog to this case than Nix, or is Nix your best case? I don't. I think Nix— Nix is just finding one item of evidence, which is the body. Here it's a whole bunch of different things that come out of this, the execution of this search warrant. First, it's not even clear that the same things would have been in the house at the time of the execution of the search warrant, much less get all the other information that follows from that. Do you have to show that all that would have played out in the same way? I don't think that there's—I don't think that— And do you have a case on this issue? I don't have a case that's better than Nix on this point, and I think ultimately we saw historically how things did play out. There was a concern about child safety here. There were two completely separate referrals from different providers demonstrating that there was child pornography being shared from this one IP address, and both agents testified that even without looking at these image files, they would have followed the same course of conduct that they actually did follow. I think I have a similar concern that Judge Collins is referencing. Fine, we'll give you that. If this played out differently and Agent Rose did her investigation, that she would have gotten the information from the Internet service provider and she would have gotten a warrant for the house and fine, all that's fine. And I think her testimony probably supports making that conclusion. My problem is I do think we have cases that talk about for the inevitable discovery doctrine to apply, the evidence has to be readily retrievable under the alternate scenario. So maybe not an exact match, it's going to play out exactly the same, but the evidence that ultimately is used for conviction, readily retrievable. The problem here is that the evidence that was used for conviction is on a cell phone that belongs to a person, and that phone and that person may or may not be present in the house when Agent Rose ultimately does her search. And if that phone and that person are not present in the house when Agent Rose does her search, we're not inevitably going to find that evidence. It's not going to be present. So how do you get there? I understand the point, and I don't think that this is more speculative than the situation was in NICS, where there were multiple steps that needed to happen in order for... I guess I don't track that, because in NICS the body is on the ground, and nobody's moving it. It's not just inherently mobile and going places, like a cell phone is. And I do think that there are cases that talk about if you're talking about evidence found on something that's easily transportable and not rooted in a location, or that could change. I mean, I think there are cases that talk about, particularly in the technology space, like evidence on a computer can change. People can manipulate the data, delete, move, change. So I'm really struggling with how you can conclude that if Agent Rose had done all the same steps and done her own investigation, that she was going to find the same stuff inevitably. How can that be? Well, I think, again, going to the concern that the agents had expressed about child safety, they were moving quickly on this. At the time that Agent Rose received back... Well, to be fair, Agent Rose was on her, I think, third attempt to get subpoena and waited months in between following up. How do you characterize that as moving quickly? Well, I think she needed that information from Gila River Telecommunications. But she wasn't on the phone every day with ICE. She didn't think of sending an agent in person herself the first two tries, did she? She didn't send an agent in person the first two tries. Does the government normally tolerate that kind of behavior from telecommunication blowing off government subpoenas? I apologize, Your Honor. I don't know how often this happens with this particular... I can see this is a relatively small... It's really troubling. They have to send an FBI agent with the subpoena to stand there to get records that, by law, they're required to give. This is a small telecom provider that just services the Gila River reservation outside the Phoenix area. But they're still subject to federal law. And I apologize. I don't have personal experience having agents serve subpoenas, so I don't know if this is a recurring problem. What I do know is that Agent Rose didn't just let this fall off her list of investigations. She did come back to it, and she did end up personally serving the subpoena. And when she got the information back, at that point, she knew that there was this other Facebook referral. She and Agent Steele are partners. They were familiar with each other's cases, and they're the only two FBI agents who worked this type of case on this task force within Arizona. As Agent Rose testified, with the Facebook, even without knowing what those Facebook images showed, the fact that Facebook had this referral because of a hash match. Let me ask you one more question about the image, just so that I understand the state of the record. Having been given the hash match, and then they were sent an attached copy of the file, but with the hash match, could the following have happened? Could the agent have called up NCMEC and said, I've got this hash match that they tell me matches your list. Can you dig out of your files that image and send it to me? Could they do that, and would they get that image? As a factual matter, Your Honor, I don't know. And I don't think that that's reflected in the record. Okay. All right, well, we've taken you quite over your time, but I think we'll hear rebuttal now. Thank you all. Thank you. Thank you, Your Honor. I wanted to pick up on the issue of the speculation and inevitable discovery. My position is, I think, much like what Judge Forrest is trying to get at, which is, yes, there is this independent investigation going on, but there are so many contingencies and speculations that are required for the government to have obtained all of the evidence that they obtained here. One is the phone, but it's not just the phone. They would need my client's statement, so he would have had to be present, he would have had to be interviewed, he would have had to consent to speak, he would have had to say the same thing, because that's the only way they link Kik to him. Actually, on page 251 of the excerpts, Agent Rose says, there's no evidence Kik was on my client's phone when it was first seized on the day of the search. And that's a difference from the Facebook investigation, because there his account was under his own name, but the Kik account is under a pseudonym. Correct, the Kik account was under a pseudonym. There was a date of birth associated with the Facebook account and everything, so it was easier to verify. And so I believe that the warrant line of cases is applicable. You may disagree with me on that, but I also agree that even setting that aside, the level of speculation is not a level of speculation that is okay for inevitable discovery to apply in this circuit. So without a case, right? So your best argument is that we haven't done it before, to your knowledge, right? Well, I think the government and I are both sort of reading NICs in different ways to support our views is what I think this comes down to. That's fair. So I guess what I come back to and what I find a little bit difficult, to be honest, is then the standard of proof was somewhat low, preponderance of the evidence. The Supreme Court has rejected clear and convincing for this particular exception. And then the district court then did find, right, that inevitable discovery, and now we're reviewing that only for clear error. So that's, to me, somewhat of the difficulty of where would you locate the clear error? So I would locate the clear error in a couple of different places. One, I think overall we've got the wrong legal standard here because I think what is being applied is I think the officer is being allowed to say essentially I would have done it right if I hadn't done it wrong or I would have done the right thing. And that's not inevitable discovery. That's not sufficient. That would be true if it were the, you know, Steele was saying I would have done it differently. But Rose is untainted. She does everything right. She may be slow, but she's doing everything right. She's incredibly slow, and I don't think that's nothing, either her slowness and the languishing of it, because that's in the record, and I think there are some real questions about whether that really would have been pursued. That's what she said, I would have done all of these things. But it would be... But that's a factual issue for the district court to hear and she's crossed as to would she really have done it, and the district court said, well, yeah, I find that she would have done it. Right, but I guess my argument is more the problem here is the legal standard is like that fact of coming in and saying I would have done all of this doesn't make the inevitable discovery doctrine apply. There's clear error, and there's clear error because of the warrant issue, which is that you don't get to have hypothetical warrants in these cases, and I believe that that line of cases then also applies to say you don't also get to have 500 ways to try to cure your defective warrant with the ultimate issue being I would have gotten the right warrant if I hadn't gotten the wrong warrant. I mean, my trouble with that is I think the warrant cases you're relying on all involve the agent who should have gotten a warrant for the search and did not and did the search anyway, and what we have here is two independent acting agents, one of whom didn't violate the Fourth Amendment when she opened the images, right, because of the private actor exception, and then she gave testimony in which the district court credited of saying, you know, if not for Agent Steele's, you know, if Agent Steele's investigation didn't exist, I still would have taken all these steps. I'm still not aware of any case that says that it's still okay to have hypothetical search warrants in this line of independent investigation. That certainly wasn't the case in this. Do you have any one thing that's not? I don't. I honestly think that sort of the converse of what's going on in the Tenth Circuit where their presumption in SUSA, which I cited in my 28J letter, is that you can have these hypothetical warrants, and then they use that to say that you can sort of clear these defective warrants. And so I think when you look at, we have a completely different area of law, and so I really think everything flows from we're not allowed to say you get a search warrant. You don't get a hypothetical search warrant and get inevitable discovery. But setting even that aside, if you don't agree with me on that, and just to be clear, Riley has said that that is clear error. I think it's also clear error insofar as the government, or the district court simply did not apply the correct legal standard to the facts at issue because of the level of speculation, because this evidence moves in various, this evidence is people, this evidence is statements, this evidence is forensic examination that can change, and there is nothing in the record that supports the conclusion that the district court, I guess, sort of conclusory reached that all of this evidence would have been obtained. Because this isn't just one thing. It's not just a body. There's a whole flow that has to go. Okay. Thank you, Counsel. I thank both counsel for your helpful arguments in this case. And the case of U.S. v. Holmes is submitted for decision.
judges: COLLINS, FORREST, SUNG